IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 1, 2002 Session

## THOMAS & ASSOCIATES, INC. v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, ET AL.

Appeal from the Circuit Court for Davidson County
Nos. 99C-3436 & 99C-3276      Thomas W. Brothers, Judge

No. M2001-00757-COA-R3-CV - Filed June 6, 2003

This appeal involves a dispute between a road contractor and the Tennessee Department of Transportation involving two construction projects in the Nashville area. Following extensive construction delays attributed to the relocation of utilities, the contractor filed claims based on negligence and breach of contract with the Tennessee Division of Claims Administration which were transferred to the Circuit Court for Davidson County. The trial court granted the Department's motion for summary judgment and dismissed all the contractor's claims. We have determined that the trial court correctly dismissed the contractor's negligence claims but that the trial court erred by denying the contractor's breach of contract claims. Accordingly, we vacate the portion of the judgment dismissing the contractor's contract claims and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part; Reversed in Part; and Remanded**

BEN H. CANTRELL, P.J., M.S., WILLIAM C. KOCH, JR., J., and WILLIAM B. CAIN, J.

Vic L. McConnell, Nashville, Tennessee, for appellant, Thomas & Associates, Inc.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Rachel L. Steele, Assistant District Attorney General, for the appellee, Tennessee Department of Transportation, State of Tennessee.

**OPINION**

**I.**

Throughout the Nineties, the Tennessee Department of Transportation ("Department") worked to update the road infrastructure in and around Nashville and Metropolitan Davidson County to accommodate increased car traffic as the area's population grew. The updating involved both building new roads and reworking old ones. In the mid-to-late Nineties, two of the road reworking projects in Nashville, which mainly involved intersection work, were Project No. 4105, sometimes called the "Little Bell Road Project" and Project No. 4622, sometimes called the "Murfreesboro Road Project." In March 1996 and February 1997, the construction firm of Thomas & Associates, Inc. ("Thomas") of LaVergne entered into two contracts worth $3.7 million with the Department to

serve as general contractor for the construction of the road improvements on both projects. The work involved mostly grading, installing underground drainage, and paving. To accomplish this work required, among other things, the widening of at least one bridge, relocating utilities, and changing or creating access to business property fronting the roadways.

Project 4105 was scheduled to take 265 calendar work days for completion by December 15, 1996. Project 4622, which had a later start date, was scheduled to take 427 calendar work days and be completed by June 15, 1998. Neither project was completed on schedule. Ultimately Project 4105 was extended by 536 calendar work days (twice its original length), and Project 4622 was extended by 690 calendar work days, more than doubling the length of that project. The principal difficulties encountered: (1) delays in relocating appurtenant utilities, and (2) failure to obtain all necessary right-of-way for the construction. Both these items were ultimately the Department's responsibility as the project owner.

According to Thomas, the extensive construction delays caused by both the utility relocation problems and the Department's failure to timely acquire all necessary right-of-ways forced the contractor to incur substantial, unanticipated costs on the two projects. Instead of making money on the two contracts, Thomas allegedly lost money. In the contractor's words, the two contracts were a "substantial financial loss." Thomas blamed this loss on the Department, whose actions, Thomas alleged, had held up the scheduled construction.

Seeking to recover its financial losses on Project 4105, Thomas filed a claim against the Department for damages with the Tennessee Division of Claims Administration in June 1999. Thomas's cause of action against the Department was premised upon breach of contract, negligence and negligence per se. In September 1999, pursuant to Tenn. Code Ann. § 9-8-402(c) (1999), the Division of Claims Administration transferred the action to the Claims Commission, which, in March 2000, ultimately transferred the claims to the Sixth Circuit Court for Davidson County,[1] where it was consolidated with a related lawsuit that Thomas had filed against Nashville Electric Service and BellSouth Telecommunications arising out of the same project.

Seeking to recover its financial losses on Project 4622, Thomas filed another claim for damages against the Department with the Tennessee Division of Claims Administration in December 1999, which, in March 2000, transferred the action to the Claims Commission. In June 2000, upon motion of Thomas, the Claims Commission transferred Thomas's Project 4622 claims against the Department to the Sixth Circuit Court for Davidson County, Tennessee, where it was consolidated with another of Thomas's pending lawsuits against the utilities over the delays related to Project 4622.

In November 2000, the Department moved for summary judgment against Thomas in both lawsuits. For grounds, the Department asserted that all of Thomas's claims were barred by the express terms of the parties' contracts and that, furthermore, the Department enjoyed sovereign immunity against all the contractor's claims. Upon consideration of the Department's motion, the circuit court granted summary judgment in both cases. The court held that: (1) Thomas's negligence

---

[1]*See* Tenn. Code Ann. § 9-8-404 (1999) (providing for the removal of claims against the State into court).

and negligence per se claims against the Department were barred by sovereign immunity; and (2) Thomas's breach of contract claims, while not barred by sovereign immunity, were untenable as a matter of law under the terms of the respective contracts. Thomas has appealed the trial court's decision in both cases.[2] With no objection from the parties, we have consolidated the two appeals for adjudication.

## II.
### THE STANDARD OF REVIEW

It is well-settled that summary judgment is available in cases involving claims of negligence, *see*, *e.g.*, *Luther v. Compton*, 5 S.W.3d 635, 640-41 (Tenn. 1999), as well as in cases asserting breach of contract. *See*, *e.g.*, *Smith v. Harriman Util. Bd.*, 26 S.W.3d 879, 884-85 (Tenn. Ct. App. 2000). Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Psillas v. Home Depot, U.S.A., Inc.*, 66 S.W.3d 860, 863 (Tenn. Ct. App. 2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion – that the party seeking the summary judgment is entitled to a judgment as a matter of law. *White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). If a party defends against a claim with a motion for summary judgment, the party asserting the claim may only overcome the motion by establishing the essential elements of the claim. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 645 (Tenn. Ct. App. 1992); *Blair v. Allied Maint. Corp.*, 756 S.W.2d 267, 270 (Tenn. Ct. App. 1988).

Summary judgments enjoy no presumption of correctness on appeal. *Nelson v. Martin*, 958 S.W.2d 643, 646 (Tenn. 1997); *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the nonmoving party, and we must resolve all inferences in the nonmoving party's favor. *Terry v. Niblack*, 979 S.W.2d 583, 585 (Tenn. 1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *See Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

A party may obtain a summary judgment by demonstrating that the non-moving party will be unable to prove an essential element of its case. *Byrd v. Hall*, 847 S.W.2d at 212-13. Once the moving party demonstrates that it has satisfied Tenn. R. Civ. P. 56's requirements, the non-moving party must show that Tenn. R. Civ. P. 56's requirements have not been satisfied. *Nelson v. Martin*, 958 S.W.2d at 647. One way for a non-moving party to fend off a motion for summary judgment

---

[2]The judgments in both cases resolve less than all the claims against all the lawsuit parties; nevertheless, the circuit court directed that both summary judgments be entered as final judgments as to all Thomas's claims against the Department, as allowed under Tenn. R. Civ. P. 54.02. The case is here by appeal of right under Tenn. R. App. P. 3(a).

is to convince the trial court that there are sufficient factual disputes to warrant a trial. The non-moving party may carry its burden by (1) pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) rehabilitating evidence challenged by the moving party, (3) producing additional evidence that creates a material factual dispute, or (4) submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery. *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d at 215 n.6; *Davis v. Campbell*, 48 S.W.3d 741, 747-48 (Tenn. Ct. App. 2001).

In this case, the summary judgments rest on two points of law. Interpreting Tenn. Code Ann. § 9-8-307(a)(1)(I) (Supp. 2002) in conjunction with the sovereign immunity provisions of Tenn. Code Ann. § 20-13-102(a) (1994), the circuit court ruled first that sovereign immunity barred Thomas's claims against the Department for both negligence and negligence per se. The court also rejected Thomas's breach of contract claims as a matter of law, based on the court's reading of the parties' contracts, specifically the contracts' "no damages for delay" provisions. In deciding whether the trial court correctly awarded summary judgment, we review both these purely legal determinations de novo.

## III.
### THOMAS'S NEGLIGENCE CLAIMS

We first determine whether sovereign immunity bars the negligence action. Thomas contends that the Department failed to use due care in coordinating the relocation of utilities on the projects. For its negligence per se cause of action, Thomas alleges specifically that the Department's actions were a violation of the relocation of utilities provisions in Tenn. Code Ann. §§ 54-5-801 through 856 (1993) (superseded 1998).[3] The trial court rejected both these negligence theories, stating, "Pursuant to Tenn. Code Ann. § 20-13-102(a), the plaintiff's claims against TDOT are barred by sovereign immunity. This Court rejects as a matter of law [Thomas's] contention that the exception to sovereign immunity [relied on by Thomas] applies to the facts of this case." Although the circuit court correctly granted summary judgment against Thomas's negligence claims, we disagree with the trial court's legal conclusions on this issue.

## A.
### Sovereign Immunity Overview

The Tennessee Constitution provides at Article I, Section 17 that suits may only be brought against the State "in such manner and in such courts as the legislature may by law direct." On this point the legislature has provided in Tenn. Code Ann. § 20-13-102(a) (1994):

> No court in the state shall have any power, jurisdiction, or authority
> to entertain any suit against the state, or against any officer of the
> state acting by authority of the state, with a view to reach the state, its
> treasury, funds, or property, and all such suits shall be dismissed as

---

[3]The 1993 version of these statutes was effective when the parties executed contracts 4105 and 4622. The current version of these statutes, Tenn. Code Ann. § 54-5-801 through 856 (1998 & Supp. 2002) remains unchanged regarding the specific provisions at issue here.

to the state or such officers, on motion, plea or demurrer of the law officer or counsel employed for the state.

These constitutional and statutory provisions set forth the principle that the State cannot be sued in its own courts, unless the State expressly consents to suit by statutory enactment of the legislature. *Brewington v. Brewington*, 215 Tenn. 475, 480, 387 S.W.2d 777, 779 (1965); *Quinton v. Board of Claims*, 165 Tenn. 201, 217, 54 S.W.2d 953, 957 (1932). The rule of sovereign immunity in Tennessee is both constitutional and statutory, and the courts lack power to amend it. *Jones v. L & N R.R. Co.*, 617 S.W.2d 164, 170 (Tenn. Ct. App. 1981). It is the legislature's province to waive the State's sovereign immunity. *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 346 (Tenn. 2002).

Here, Thomas claims that the State has waived its sovereign immunity. In 1984 the General Assembly created the Tennessee Claims Commission and vested it with jurisdiction to adjudicate certain defined contract and tort claims against the State. As to those defined claims the State has expressly waived immunity. Thomas maintains that its negligence and negligence per se claims fall under Tenn. Code Ann. § 9-8-307(a)(1)(I) (Supp. 2002), which in effect waives the State's sovereign immunity for "[n]egligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways . . .."

In considering Thomas's argument, we keep in mind that statutes permitting the State to be sued for money damages must be strictly construed because they are in derogation of the State's normal sovereign immunity. *Hembree v. State*, 925 S.W.2d 513, 516 (Tenn. 1996); *Beare Co. v. Olsen*, 711 S.W.2d 603, 605 (Tenn. 1986); *Stokes v. University of Tennessee*, 737 S.W.2d 545, 546 (Tenn. Ct. App. 1987). Any statute purporting to waive the State's sovereign immunity must be "so plain, clear and unmistakable as to leave no doubt of the intention of the legislature." *Quinton v. Board of Claims*, 165 Tenn. at 214-15, 54 S.W.2d at 957; *Hise v. State*, 968 S.W.2d 852, 853 (Tenn. Ct. App. 1997). Courts will not presume that the General Assembly waived sovereign immunity any more than is expressed in the statutory language. *Daley v. State*, 869 S.W.2d 338, 340 (Tenn. Ct. App. 1993). We must therefore gauge Thomas's argument by carefully analyzing the statute granting jurisdiction to the Claims Commission. *See Northland Ins. Co. v. State*, 33 S.W.3d 727, 729 (Tenn. 2000).

## B.
## Thomas's Negligence and Negligence Per Se Claims

This case does not present merely a chance dispute between unrelated members of the general public. Thomas and the Department are embroiled in this litigation owing to their commercial relationship to each other, which rests on contract. Any proper negligence analysis in this case must factor in the parties' contractual relationship on these two projects.

To prevail strictly on a claim for negligence, the complaining party must establish (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of duty; (3) injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *Lett v. Collis Foods, Inc.*, 60 S.W.3d 95, 99 (Tenn. Ct. App. 2001). Duty, in terms of negligence, is a

person or entity's legal obligation owed to the plaintiff to conform to a reasonable standard of care, which under foreseeable circumstances will prevent harm to others. *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d at 89; *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45 S.W.3d 588, 599 (Tenn. Ct. App. 2001).

Establishment of a legal duty owed by the defendant is an absolute prerequisite to any recovery under a theory of negligence. *See*, *e.g. Plunk v. National Health Inv'rs, Inc.*, 92 S.W.3d 409, 413 (Tenn. Ct. App. 2002); *Church v. Perales*, 39 S.W.2d 149, 163 (Tenn. Ct. App. 2000). As the Supreme Court said nearly a century ago, the right to recover for injuries resulting from negligence is based upon violation of a duty, and where there is no duty there can be no negligence. *Chattanooga Warehouse & Cold Storage Co. v. Anderson*, 141 Tenn. 288, 296, 210 S.W. 153, 155 (1919). Determining the existence and extent of one's legal duty to prevent harm to others is a question of law for the courts. *Staples v. CBL & Assoc., Inc.*, 15 S.W.3d at 89; *Willoughby v. Montgomery Elevator Co.*, 87 S.W.3d 509, 511 (Tenn. Ct. App. 2002). In deciding the issue of duty, courts look at whether a particular defendant was under any obligation imposed by law for the benefit of a particular plaintiff. *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990).

## 1.
## Did the Department Owe Thomas a Common-Law Duty to Not Delay Construction?

It is at this point – the question of duty – that the contractual relationship of these parties becomes material to our analysis. Tort law, including the law of negligence, is designed to protect all persons generally from the risk of physical or, in some cases, emotional harm to their persons or property. *Nuckles v. Tenn. Elec. Power Co.*, 155 Tenn. 611, 613, 299 S.W. 775, 775 (1927); *Town of Alma v. Azco Constr. Co.*, 10 P.3d 1256, 1262 (Colo. 2000). Tort obligations are, in general, obligations imposed by law, without any necessity of a consensual undertaking between the parties. *De Ark v. Nashville Stone Setting Corp.*, 38 Tenn. App. 678, 685, 279 S.W.2d 518, 522 (1955). The socially-imposed obligation to use care, commonly referred to as "duty," is usually considered owed to all those within range of harm, without regard to whether those persons have a contract with the actor. *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 197 (Tenn. 1992); *Boyd v. Coca Cola Bottling Works*, 132 Tenn. 23, 28, 177 S.W. 80, 81 (1915); *Town of Alma v. Azco Constr. Co.*, 10 P.3d at 1262.

Contract duties are obligations of a different nature with a smaller scope. Party-specific, they arise out of "the manifested intention of the parties to a bargaining transaction." W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 92, at 656 (5th ed. 1984). Any breach of them, whether wilful or careless, is a breach of duties that the parties have fixed for themselves.

If a duty to conform to a standard exists between the parties irrespective of contract, and the defendant is negligent, the damaged plaintiff, generally speaking, may sue in tort. *Jacobs v. Federal Deposit Ins. Corp.*, 638 F. Supp. 214, 215 (E.D. Tenn. 1986); *Goodall v. Doss*, 44 Tenn. App. 145, 154, 312 S.W.2d 875, 879 (1958); *see also Town of Alma v. Azco Constr., Inc.*, 10 P.3d at 1262. However, if the only source of duty between a particular plaintiff and defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action. *Strum v. Exxon Co., U.S.A.*, 15 F.3d 327, 329-33 (4th Cir. 1994); *Town of Alma v. Azco Constr., Inc.*, 10 P.3d at 1262; *Griffin Plumbing & Heating v. Jordan*, 463 S.E.2d 85, 88 (S.C. 1995).

Ordinarily, it is not a tort for one of the contracting parties to breach the contract. Conduct constituting breach of contract becomes tortious only when it also violates a duty, independent of the contract, arising from wider principles of social responsibility. *Allapattah Servs. v. Exxon Corp.*, 61 F. Supp. 2d 1326, 1328 (S.D. Fla. 1999); *Quorum Health Resources, Inc. v. Carbon-Schuylkill Comm. Hosp., Inc.*, 49 F. Supp. 2d 430, 432 (E.D. Pa. 1999); *Erlich v. Menezes*, 981 P.2d 978, 983 (Cal. 1999); *Nelson Northwestern Sav. & Loan Ass'n*, 381 N.W.2d 757, 759 (Mich. Ct. App. 1985); *Sheppard v. Yara Eng'g Corp.*, 281 S.E.2d 586, 587 (Ga. 1981). Short of that, a party's breach of contract remains enforceable as a contract action – not as a tort action – regardless of whether the breach was an intentional one or an unintentional one caused by carelessness. *Oak Ridge Precision Indus. Inc. v. First Tenn. Bank Ass'n.*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992); *Harvest Corp. v. Ernst & Whinney*, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980).

Here, Thomas complains that the Department was careless both in supervising and in coordinating the relocation of utilities, as well as in not timely acquiring all the needed right-of-way for the projects. However, there was no common law duty on the Department to do either of those things timely for Thomas's benefit or for anyone else's benefit. The Department's duty to Thomas on both counts was, if anything, a contractual duty related specifically to the two construction projects. To the extent that the Department merely breached a contractual duty toward Thomas, Thomas cannot maintain an action against the Department for negligence. Unless Thomas can identify some other source of duty, it has no claim against the State for negligence within the exception to sovereign immunity carved out by Tenn. Code Ann. § 9-8-307(a)(1)(I).

**2.**
**Did the Department Owe Thomas a Statutorily-imposed Duty**
**Enforceable Against the State by Private Right of Action?**

Apart from contract, Thomas points up one other potential source for duty in this case: the utility relocation statutes found at Tenn. Code Ann. §§ 54-5-801, -856 (1998 & Supp. 2002). Thomas contends that those statutes imposed certain requirements on the Department that it was bound to observe during the course of Projects 4105 and 4622. According to Thomas, those statutorily-imposed obligations constitute the duty that the Department breached in this case.

Thomas correctly argues that legislative enactments can, as a matter of law, create duties, the breach of which can give rise to an action for negligence. *See Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994); *see also Sinclair v. Okata*, 874 F. Supp. 1051, 1062-64 (D. Alaska 1994); *Timm v. Clement*, 574 N.W.2d 368, 372 (Iowa Ct. App. 1997); *Hunt ex rel. Hasty v. Department of Labor*, 480 S.E.2d 413, 415-16 (N.C. Ct. App. 1997); Restatement (Second) of Torts § 874A (1979). A defendant's failure to perform a statutorily-imposed duty that injures a party can constitute negligence per se, *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 35 (Tenn. 1988); *Alex v. Armstrong*, 215 Tenn. 276, 283, 385 S.W.2d 110, 114 (1964); *Little v. NC & St. L. Ry.*, 39 Tenn. App. 130, 145-46, 281 S.W.2d 284, 292 (1954), and the resulting liability is tort liability. *Jacobs v. Federal Deposit Ins. Corp.*, 638 F. Supp. at 215; STUART M. SPEISER, ET AL., THE AMERICAN LAW OF TORTS § 1:20 (1983).

Not every violation of a statute, however, will support a claim of negligence per se. To show negligence per se, the plaintiff must prove that the violated statute imposed a duty or prohibited some

act for the plaintiff's or the public's benefit. *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d at 937; *Nevill v. City of Tullahoma*, 756 S.W.2d 226, 232-33 (Tenn. 1988); *King v. Danek Med. Inc.*, 37 S.W.3d 429, 458 (Tenn. Ct. App. 2000). The claiming party must also show that he or she was within the class of persons to be protected by the act. *Cook v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d at 937; *Britton v. Claiborne County*, 898 S.W.2d 220, 223 (Tenn. Ct. App. 1994); *Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn Ct. App. 1992).

Even if a plaintiff can show that he or she is within the class to be protected by the statute, before the plaintiff can make out a negligence per se case, the statute relied upon must establish a standard of care. *King v. Danek Med. Inc.*, 37 S.W.3d at 460; *see also Scovill v. City of Astonia*, 921 P.2d 1312, 1318-20 (Or. 1996); Restatement (Second) of Torts § 874A cmt. e. When a statute provides that under certain circumstances particular acts shall or shall not be done, the statute may be interpreted as fixing a standard of care. *Cook v. Spinnaker's of Rivergate*, 878 S.W.2d at 937. At the same time, as we have very recently said

> Where a statutory provision does not define a standard of care but merely imposes an administrative requirement, such as the requirement to obtain a license or to file a report to support a regulatory scheme, violation of such requirement will not support a negligence per se claim. Even if the regulatory scheme as a whole is designed to protect the public or to promote safety, the . . . duty . . . [must be something more than] an administrative requirement.

*Bish v. Smith & Nephew Richards, Inc.*, No. W1998-00373-COA-R9-CV, 2000 WL 1294324, at *2 (Tenn. Ct. App. Aug. 23, 2000); *perm. app. denied* (Tenn. Oct. 29, 2001); *King v. Danek Med., Inc.*, 37 S.W.3d at 460.

Thomas bases its negligence per se claim on the utility relocation statutes. The utility relocation statutes were enacted to facilitate the orderly and economical relocation of utilities when made necessary by highway improvements. Tenn. Code Ann. § 54-5-801(a). The statutes declare public policy in this area and were enacted to promote the public interest. Tenn. Code Ann. § 54-5-801(h). With the utilities relocation statutes, the legislature has determined and announced that

> [t]he obligation of utility relocations is a burden on the public in this state, whether initially borne by the state or the municipally or cooperatively owned utility or in part by both, and it is, therefore, in the public interest that such burden be minimized to the extent that same can be done consistently with the principal purpose of such streets and highways for vehicular movement of persons and property; therefore, it is the intent of the general assembly to ensure that the state's police power in requiring relocation of utilities shall be exercised in a reasonable manner.

Tenn. Code Ann. § 54-5-801(f).

The statutes provide that the Commissioner of Transportation "shall direct and control the reasonable manner and time of effecting any . . . relocation so as to promote the public interest in the highway improvement without undue cost or risk and without impairment of utility service . . .." Tenn. Code Ann. § 54-5-803(a). To accomplish the relocation of utilities, the commissioner is authorized to enter into agreements with utilities "upon such reasonable terms and conditions as [he or she] shall approve as necessary or appropriate" in the interest of the state's public highway program. Tenn. Code Ann. § 54-5-803(c). The statutes are intended to regulate the removal, relocation, or adjustment of utilities made necessary by road construction. Tenn. Code Ann. § 54-5-851.

The Department convincingly points out that the relocation of utilities statutes, read as a whole, mainly govern the rights, responsibilities, and the course of dealings between the Department and utility owners. The statutes set forth specific procedures for both the Department and utility owners to follow to facilitate timely, economical relocation of utilities when necessitated by road construction. The statutes do not expressly and directly address the relationship between the Department and road contractors who construct roadwork; that relationship remains largely a matter of contract law.

We recognize that the statutes do impose a duty on the Department to exercise the State's power to relocate utilities "in a reasonable manner." Tenn. Code Ann. § 54-5-801(f). For the Department to act in a reasonable manner is intended to benefit the public, which should incidentally benefit roadbuilders as well. Nevertheless, the statutes are not aimed at the roadbuilders. It is primarily with respect to utility owners that the Department is statutorily required to take certain actions. Any benefit conferred on road contractors under the relocation of utilities statutes is at most an externality or a "residual benefit."[4]

To support its negligence per se claim, Thomas points specifically to Tenn. Code Ann. § 54-5-854(c) and says that "[t]here can be no doubt that the . . . [statute] mandates that the utility owners submit and that [the Department] approve a schedule of working days for . . . proposed utility relocation work." Thomas alleges that the Department failed to require and approve a meaningful schedule of working days for utility relocation on these two projects. However, we find that, read in context, Tenn. Code Ann. §54-5-854(c) does not create a public policy duty owed to the contractor by the Department.

Tenn. Code Ann. § 54-5-854, read as a whole, provides that the Department will send copies of its proposed construction plans to the affected utility, who will then map out where its lines or pipes are located within the project along with "any proposed new location of such facilities." Tenn. Code Ann. § 54-5-854(b). The utility owner must submit a schedule of working days to accomplish any relocation. Once submitted, the Department can approve that relocation plan and accompanying work schedule "if reasonable." Tenn. Code Ann. § 54-5-854(c). If the utility owner refuses to reasonably cooperate, the Department and its contractors may go ahead with the project without liability for any damage to utilities located in the construction area. Tenn. Code Ann. § 54-5-854(g). Nothing about Tenn. Code Ann. § 54-5-854(c), imposes a public policy duty on the Department to

---

[4]*Premium Fin. v. Crump Ins. Servs.*, 978 S.W.2d 91, 94 (Tenn. 1998).

act in any certain way toward a road contractor regarding scheduling utility relocation work. Whatever duty the Department owed to Thomas in that regard came not from Tenn. Code Ann. § 54-5-854(c) but from the Department's contract with Thomas.

Thomas also cites Tenn. Code Ann. §§ 54-5-803(a) and -856 as possible sources of duty. The former statute provides in pertinent part that the commissioner of transportation shall direct and control the reasonable manner and time of effecting any utility relocation so as to promote the public's interest in highway improvement without undue cost or risk and without impairment of utility service. The latter statute provides that the Department's resident engineer shall act as liaison between the utility owner and the contractor on road construction projects involving relocation of utilities. Thomas cites no precedent, and we have found no precedent, supporting the proposition that a breach by the Department of either of these statutes will support a private right of action against the State for negligence per se.

Nothing in the utility relocation statutes expressly grants roadbuilders a private right of action for negligence per se should the Department not follow the statutory regimen exactly. Courts will not casually engraft private rights of enforcement onto government regulation statutes absent some clear indication that the legislature intended that the statutes should be enforced by private right of action. *Premium Fin. v. Crump Ins. Servs.*, 978 S.W.2d at 94; *Reed v. Alamo Rent-a-Car, Inc.*, 4 S.W.3d 667, 690 (Tenn. Ct. App. 1999). This is particularly true in cases involving sovereign immunity, where the State cannot be subjected to suit unless the words of an act are so plain, clear, and unmistakable so as to leave no doubt about the General Assembly's intent to expose the State to litigation. *Quinton v. Board of Claims*, 165 Tenn. at 214-15, 54 S.W.2d at 957; *Daley v. State*, 869 S.W.2d 338, 340 (Tenn Ct. App. 1993). *See also* Tenn. Code Ann. § 9-8-307(a)(1)(N)(Supp. 2002). Notwithstanding Thomas's reliance on the utility relocation statutes, we find that Thomas has failed to show that the State owed it any statutory duty in this case privately enforceable by a negligence per se action.

**3.**

We have examined all the arguments behind Thomas's contention that the trial court erred in dismissing its negligence and negligence per claims. We hold that Tenn. Code Ann. § 9-8-307(a)(1)(I) waives the State's sovereign immunity for negligence in the planning and construction of roadways. However, for a negligence plaintiff to prevail at summary judgment, the plaintiff must establish a prima facie case on the essential element of duty. In this case, Thomas has failed to do that as a matter of law. There is no common-law duty on the State to relocate utilities in the construction area so as to not delay the work, and there is no tort duty on the State to timely acquire all the needed right of ways. Thomas's invocation of the utility relocation statutes as support for a negligence per se claim against the State is equally meritless. Those statutes are primarily intended to govern the relationship between the Department and utility owners, and their violation will not support a private negligence per se action by road contractors against the State. Because Thomas failed to establish that the Department owed it any duty other than a contractual one, we affirm summary judgment against Thomas on all of Thomas's claims for negligence.

Having disposed of Thomas's tort claims, we turn now to Thomas's claims for breach of contract. Thomas says that the parties' contracts expressly incorporated the utility relocation statutes and that the Department failed to follow certain provisions contained in those statutes, thus breaching the contracts. Thomas maintains also that the parties' contracts expressly provided that the Department had acquired all the needed right-of-way for the road construction with only certain identified exceptions. As to those exceptions, the contracts provided month-and-day-specific anticipated acquisition dates, after which those right-of-way parcels would be available. Thomas contends that the Department breached the contracts by not having certain of those parcels available for construction by the specified anticipated availability dates, thus delaying Thomas in performing its part of the contracts.

The trial court found that the facts were not in dispute concerning the breach of contract claims. The court ruled, however, that exculpatory provisions in the contracts, designed to limit the Department's liability if work got delayed, barred any recovery on Thomas's part, even if the Department's actions contributed to prolonging the job. The court's conclusion was a legal one, based on the contracts' language.

The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999); *Galleria Assocs., L.P. v. Mogk*, 34 S.W.3d 874, 876-77 (Tenn. Ct. App. 2000). When the parties have reduced their contract to writing, their intentions are reflected in the contract itself. *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.*, 884 S.W.2d 458, 461 (Tenn. Ct. App. 1994). Thus, contracting parties' rights and obligations should be governed by their written contract. *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App. 1999).

In the absence of fraud or mistake, the courts must construe contracts as written. *Frank Rudy Heirs Assocs. v. Sholodge, Inc.*, 967 S.W.2d 810, 814 (Tenn. Ct. App. 1997). They must take a position of neutrality toward the parties, *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993), and must not concern themselves with the contract's wisdom or folly. *Chapman Drug Co. v. Chapman*, 207 Tenn. 502, 516, 341 S.W.2d 392, 398 (1960); *Brooks v. Networks of Chattanooga, Inc.*, 946 S.W.2d 321, 324 (Tenn. Ct. App. 1996). Instead, the courts must enforce the parties' agreement according to its plain terms, *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975), and must be careful not to rewrite an agreement under the guise of construing it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d at 682.

**A.**
**The Department's Contractual Duty to Thomas Under the Utility Relocation Statutes**

Contracts 4105 and 4622 both include a note on the cover page of each stating that "[t]he Plans and Specifications for Road and Bridge Construction and applicable sections of Title 54 and Chapter 4 of Title 12 of Tennessee Code Annotated are made a part hereof fully and completely as if attached hereto." Thomas argued below, and the trial court agreed, that this language incorporated the utility relocation statutes, Tenn. Code Ann. §§ 54-5-801, -856, into the contracts. On appeal, the

Department makes a weak argument against that reading of the documents. The Department emphasizes that the quoted language appears only in the form of a note on the bottom of the cover sheet of the original proposal contract, which the Department characterizes as "first and foremost a bid document."

The Department, however, admits that once a road project is awarded, the proposal contract becomes part of the final contract between it and the successful bidder.[5] This, of course, is consistent with settled legal notions of contract integration -- the principle that prior or contemporaneous agreements assimilate into the final contract. *See* ARTHUR CORBIN, CORBIN ON CONTRACTS, § 31 (Single vol. ed. 1952). Consequently, the only question for us is whether the language Thomas points to can be reasonably construed to encompass the utility relocation statutes found in Title 54. We hold that it can. The Department, by incorporating those provisions into their contracts, voluntarily assumed certain contractual duties toward Thomas.[6]

Based on the utility relocation statutes, Thomas argues that the Department was required to determine, prior to commencing construction, which utility owners had facilities in the affected highway right-of-way. Tenn. Code Ann. § 54-5-853(a). The Department then had to provide the utility with complete project construction plans. Tenn. Code Ann. § 54-5-854(a). The utility owner then had to mark out the approximate vertical and horizontal locations of existing underground utilities, along with the approximate horizontal locations of above ground utilities, and had to indicate the proposed new location of such facilities and additional facilities within all rights-of-way shown on the project plans. Tenn. Code Ann. § 54-5-854(b). The utility owner was also required to prepare and submit to the Department "a plan and schedule of working days" to accomplish the relocation of conflicting utilities. Tenn. Code Ann. § 54-5-854(b). After the utility owner submitted its plan and schedule of working days, the Department had to approve them, if reasonable, and notify the owner. Tenn. Code Ann. § 54-5-854(c). The Department also had to notify utility owners reasonably in advance of the beginning date for utility relocation. Tenn. Code Ann. § 54-5-854(c). Finally, the Department's resident engineer was supposed to act as liaison between the utility owner and the contractor on the construction project. Tenn. Code Ann. § 54-5-856. All these things, says Thomas, were contractual duties owed by the Department.

---

[5]"Contract" is defined in Section 101.13 of the documents to include

> the Instructions to Bidders, Proposal, all conditions and terms of the contract form, Contract bond, Letter of Credit where applicable, Specifications, Supplemental Specifications, Revisions and Additions, Special Provisions, and Addenda, Standard Drawings and Contract Plans, the Work Order, Construction Changes and Supplemental Agreements that are required to complete the construction of the project in an acceptable manner including authorized extensions thereof; all of which constitute one instrument.

[6]We note that for parties to open-endedly incorporate in their contracts unspecified "applicable sections" of the state code may prove unwieldy or unwise. That, however, is their business. The Department drafted the contract language here; if the Department wishes to exclude the utility relocation statutes from incorporation in future contracts, it can and should adopt more narrowly-drawn language on this point.

**B.**
**The Legal Effect of the No Damages For Delay Clause**

In response to Thomas's contentions, the Department raises a contractual defense that potentially short-circuits the fight over whether it complied in every particular with the relocation of utilities statutes. The Department counters Thomas's arguments by interposing, among other things, the two contracts' "no damages for delay" provisions. That provision in both contracts states:

> It is understood and agreed that the Contractor has considered in his bid all of the permanent and temporary utility appurtenances in their present and relocated positions, any proposed utility capital improvements, and the Contractor has contacted the utility owner in regard to their proposed schedule of work and that no additional compensation will be allowed for any delays, inconvenience or damage sustained due to utilities or utility adjustment.

The trial court construed this clause as legally barring Thomas's claims for breach of contract.

**1.**

"No damages for delay" clauses are commonly used in the construction industry. *John E. Green Plumbing & Heating v. Turner Constr.*, 742 F.2d 965, 966 (6th Cir. 1984). They appear commonly in road construction contracts involving the relocation of utilities. *See*, *e.g.*, *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1070 (Ind. Ct. App. 2001); *Mississippi Transp. Comm'n v. Ronald Adams Constr.*, 753 So.2d 1077, 1086 (Miss. 2000); *Davis Constr. Corp. v. County of Suffolk*, 539 N.Y.S.2d 757, 758 (App. Div. 1989); *Brown Bros., Inc. v. Metropolitan Gov't*, 877 S.W.2d 745, 749 (Tenn. Ct. App. 1993). The clauses are meant to further the protection of the public interest and are "aimed generally against the contractor . . . with a view of limiting the cost of an improvement to the sum agreed upon and such additional sums as are specially provided for." *Pitt Constr. Co. v. City of Dayton*, 237 F. 305, 313-14 (6th Cir. 1916).

Courts normally interpret such clauses according to their plain and ordinary meaning, *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d at 1070, as relieving the government from having to pay road contractors any additional monetary compensation for construction delays caused by problems in relocating utilities. *Little Rock Wastewater Util. v. Larry Moyer Trucking, Inc.*, 902 S.W.2d 760, 765 (Ark. 1995); *See*, *e.g.*, *Brown Bros. Inc. v. Metropolitan Gov't*, 877 S.W.2d at 749-50 (denying a roadbuilder's claim for delay damages). "No damages for delay" clauses are normally valid and enforceable. *Triple R Paving, Inc. v. Broward County*, 774 So.2d 50, 54 (Fla. Dist. Ct. App. 2000); *Mississippi Transp. Comm'n v. Ronald Adams Constr.*, 753 So.2d at 1087; *United States ex rel. Williams Elec. Co. v. Metric Constructors, Inc.*, 480 S.E.2d 447, 448 (S.C. 1997).

The Indiana Court of Appeals has explained how such contractual clauses operate in cases involving utility relocation. As that court has spelled out, "no damages for delay" provisions do not completely relieve the government of its duties under a road construction contract. Whatever steps the government is obliged to take to facilitate timely relocation of utilities, it must take them. However, if anything goes wrong, the "no damages for delay" clause shifts the risk of loss – which

in all contracts must lie somewhere – to the roadbuilder and limits the roadbuilder's remedy for delays caused by utility relocation during construction. *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d at 1071, 1073. The Indiana court has pointed out that contracts containing such clauses are not as one-sided as they may seem:

> Limiting the remedy for relocation delays does not render the Department's contractual obligations meaningless. The contract [allows] that unnecessary delays in the removal or relocation of the utilities may justify extending the completion date for the project; such unnecessary delays would encompass delays caused by a breach of the Department's contractual obligations. Assuming that the Department somehow breached its contractual obligation by failing to use every weapon in its arsenal to force the utilities to relocate in an expeditious manner, the contract provides that the remedy for this type of unnecessary delay is limited to an extension of time for the completion of the project.

*Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d at 1071.[7]

When government road construction contracts contain "no damages for delay" clauses, bidding contractors remain free to formulate and submit bids that account for the possibility of delay due to problems with relocating utilities. Contractors can also elect not to bid on such contracts, if they, as a business matter, do not want to assume that risk of loss. *Indiana Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d at 1074. As we said on this issue in *Brown Brothers*: "Parties to a contract are free to allocate risks and burdens between themselves as they see fit." *Brown Bros., Inc. v. Metropolitan Gov't*, 877 S.W.2d at 749.

At the same time, contractors may avoid the operation of "no damages for delay" clauses under certain circumstances. Because "no damages for delay" provisions are considered exculpatory clauses, *i.e.*, contractual terms that release a party from liability for its own acts, courts have developed a set of exceptions to their enforcement. Notwithstanding a contract's "no damages for delay" clause, a contractor may be entitled to delay damages in certain cases if the contractor can demonstrate that the delay (1) was of a kind not contemplated by the parties, (2) amounted to an abandonment of the contract, (3) was caused by bad faith, or (4) was caused by active interference. *Brown Bros., Inc. v. Metropolitan Gov't*, 877 S.W.2d at 749; *see also PYCA Indus., Inc. v. Harrison County Waste Water Mgmt. Dist.*, 177 F.3d 351, 362 (5th Cir. 1999); *Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d 569, 578-79 (D.C. 1981). Whether a particular case fits under one of these exceptions to enforceability can create a genuine issue of material fact. *Mississippi Transp. Comm'n*

---

[7]That happened in this case. Both contracts contained target completion dates for the work, after which the Department was entitled to withhold per diem liquidated damages from Thomas. Upon application of Thomas, the Department agreed to amend both the Little Bell Road and Murfreesboro Road contracts to extend the completion dates due to conflicts in the relocation of utilities. According to the Department, the State waived recovery of liquidated damages in the amount of $402,960 on the Little Bell Road project. On the Murfreesboro Road project, there was also a supplemental agreement extending the time for completion due to utility conflicts. Due to utility delays the completion date was extended for 162 days. As a result, says the Department, the State waived recovery of liquidated damages due to utility relocation problems on the Murfreesboro Road project in the amount of $260,658.

*v. Ronald Adams Constr.*, 753 So.2d at 1088; *Blake Constr. Co. v. C.J. Coakley Co.*, 431 A.2d at 579; *cf. Brown Bros., Inc. v. Metropolitan Gov't*, 877 S.W.2d at 749-50 (analyzing the factual bases for bringing the contractor's case within the exceptions to enforcement of a "no damages for delay" clause).

**2.**

When we turn to the facts of this case, and view them at summary judgment stage in the light most favorable to Thomas, we cannot find that the contractor has created a triable issue under any of the exceptions to the "no damages for delay" clauses. Thomas complains that the Department did not do enough to coordinate the relocation of utilities. Basically the contractor maintains (1) that the Department never required the utilities to submit a meaningful schedule of working days with specific start and end dates for the two projects and (2) that the relocation plans submitted by the utilities and approved by the Department did not contain vertical locations for existing underground lines. Also Thomas maintains that the Department's resident engineer failed to properly act as a liaison between Thomas and the utility owners.

While the relocation of utilities statutes do anticipate that the Department will do these things, the parties' contracts in this case expressly shifted these obligations partially back to the contractor. That made sense because the contractor, not the Department, bore the risk of loss. The contract made clear that the contractor was responsible to deal directly with the involved utilities to secure timely relocation of affected lines. Specifically, the construction plans and drawings for both contracts, which were provided to Thomas, included these general notes pertaining to utilities:

> UTILITIES
> The locations of utilities shown within these plans are approximate only. Exact locations shall be determined in the field by contacting the utility companies involved.
>
> Unless otherwise noted, all utility adjustments will be performed by the utility or its representative. The contractor and utility owners will be required to co-operate with each other in order to expedite the work required by this contract.
>
> Prior to submitting his bid, the contractor will be solely responsible for contacting owners of all affected utilities in order to determine the extent to which utility relocations and/or adjustment will impact the schedule of work for the project. While some work may be required 'around' utility facilities that will remain in place, other utility facilities may need to be adjusted concurrently with the contractor's operations.
>
> The contractor shall notify each individual utility owner of his plan of operation in the area of the utilities. Prior to commencing work, the contractor shall contact the utility owners and request them to properly locate their respective utilities on the ground. This

-15-

notification shall be given at least three (3) business days prior to commencement of operations around the utility.

The final contracts expressly incorporated these notes. The contracts also included the following provisions in the Standard Specifications at ¶ 105.07:

Information contained in the contract documents regarding utility locations is advisory only and shall not be construed as being a representation of completeness or accuracy. *The Contractor shall contact the owners of the various utilities to determine the exact location of the utilities and the owner's schedule of work.* Unless otherwise noted, all utility adjustments will be performed by the Utility or its representative. The Contractor shall cooperate with the owners of any utilities in their adjustment operations. (Emphasis added.)

For purposes of summary judgment, we accept Thomas's showing that the Department did not in all particulars follow the utility relocation statutes to the letter on these projects. However, the above-quoted contract provisions make plain that both parties envisioned that the contractor could and would do the things it needed to do to efficiently relocate utilities on the two highway projects, including obtaining a meaningful work schedule from the utility owners.

When we analyze this case under the exceptions to enforcement of the exculpatory provision that we recognized in *Brown Brothers*, Thomas has not created a triable issue on any of the exceptions. The delay in the present case was exactly the kind contemplated by the parties and expressly covered in the contract, so the first exception does not apply. Bad faith and abandonment of the contract are obviously not issues here. Thomas has made no factual showing of either of those. As to the final exception, Thomas has in no way shown that the Department actively interfered with its operations, but merely that the Department could have done more to timely coordinate the relocation of utilities. To show the type of active interference that would render the "no damage for delay" clause unenforceable, the contractor had to point up something far more affirmative than lack of diligence. *Brown Bros., Inc. v. Metropolitan Gov't.*, 877 S.W.2d at 750. Thomas has shown no such conduct on the part of the Department. We conclude here, as in *Brown Brothers*, that the contractor has not shown why its delay claim related to utility relocation should not be barred by the "no damages for delay" provisions in the contracts.

### C.
### The Department's Failure to Timely Acquire All Needed Right-of-Way

The circuit court held that all of Thomas's breach of contract claims were legally barred by the "no damages for delay" clause in the parties' contract. We note, however, that the "no damages for delay" provision, by its terms, pertains only to delays arising out of the adjustment of utilities. In this case, Thomas has also alleged that part of its delay damages flowed from the Department's failure to timely acquire certain right of way parcels needed for the road construction. Because these breach of contract claims fall outside the contract's exculpatory clause related to utility delays, we must consider them separately.

-16-

Contracts for construction include the implied understanding that the contractor will be given a reasonable opportunity to perform. *Foster & Creighton Co. v. Wilson Contracting Co., Inc.*, 579 S.W.2d 422, 425-26 (Tenn. Ct. App. 1978). As we have said,

> Each party to the contract [is] under an implied obligation to [allow] the other party's performance of the contract. Each party [has] the right to proceed free of hindrance by the other party, and if such other party . . . prevented the performance to such an extent as to render the performance difficult and diminish the benefits to be received, the first party [may] treat the contract as broken . . ..

*Wil-Helm Agency v. Lynn*, 618 S.W.2d 748, 751-52 (Tenn. Ct. App. 1982) (citations omitted). Like other jurisdictions, Tennessee recognizes this implied obligation of good faith and fair dealing as part of construction contracts. *ACG, Inc. v. Southeast Elevator, Inc.*, 912 S.W.2d 163, 168 (Tenn. Ct. App. 1995); *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990).

Consistent with that principle, it is implied in every construction contract that the contractor shall be furnished with the work site necessary to perform the contract. *Fritz-Rumer-Cooke Co. v. United States*, 279 F.2d 200, 201 (6th Cir. 1960); *Missouri Dep't of Transp. ex rel. P.R. Developers, Inc. v. Safeco Ins. Co.*, 97 S.W.3d 21, 36 (Mo. Ct. App. 2002); *Johnson, Drake, & Piper, Inc. v. State*, 259 N.Y.S.2d 685, 694 (Ct. Cl. 1963). A project owner's failure to do that may constitute breach of contract. *See American Pipe & Constr. Co. v. Westchester County*, 292 F. 941, 952 (2nd Cir. 1923) (holding that the failure to provide right-of-way was considered breach of contract warranting recovery of damages legitimately flowing from the breach); *Corrino Ciretta Constr. Corp. v. City of N.Y.*, 493 N.E.2d 905, 912 (App. Div. 1986) (finding that the contractee failed in its obligation to obtain title to the work site or make it available to the contractor preventing the contractor from commencing construction). *Nix, Inc. v. City of Columbus*, 171 N.E.2d 197, 201 (Ohio Ct. App. 1959) (holding that a breach of the obligation to provide right-of-way on which contractor could begin and perform work gives a right to damages).

The contracted-for construction work on both the Little Bell Road and the Murfreesboro Road projects required the State to acquire additional road right-of-way. The contracts on both projects stated that on each, all the needed right-of-way would be obtained before the effective date of each contract. To the extent that any needed additional parcels had not been acquired, both contracts contained a special clause dealing with that. The clause, Special Provision 107C, identified the specific unacquired tracts. On Project 4105, Special Provision 107C indicated that all right-of-way was available for construction, except for Tract Nos. 1, 4, 12 and 93. The special provision indicated that the anticipated availability date for all tracts on Project 4105 would be April 1, 1996. Similarly, on Project 4622, Special Provision 107C indicated that all right-of-way was available for construction, except for Tract Nos. 9 and 10. On Project 4622, Special Provision 107C indicated that the anticipated availability date of Tracts Nos. 9 and 10 would be March 1, 1997.

The materials that Thomas submitted at the summary judgment hearing show that on Project 4105, Tract Nos. 1, 2, and 18 were not available when the contract was executed, and two of the tracts were not available until, at the earliest, June 1996. Furthermore, Tract No. 2 was not available until, at the earliest, September 1998 – nearly two years beyond the contract's original completion

date. On Project 4622, Tract Nos. 9, 13, and 17 were not available when the contract was executed and were not available as of the anticipated date of March 1, 1997. As it developed, Tract Nos. 9 and 13 were not available until the end of July 1997. Tract No. 17[8] was not available until September 25, 1998 – three months past the original completion date for Project 4622. It is undisputed that the delay in acquiring all right-of-way for Projects 4105 and 4622 correspondingly delayed the progress of utility relocation and general construction. At least part of Thomas's claim for damages relates to this delay in right-of-way acquisition.

On this point – the Department's delay in acquiring all necessary right-of-way – we find that Thomas has created a triable issue that should not have been concluded by summary judgment. The undisputed facts show that construction was delayed, at least in part, by the Department's failure to timely acquire all needed right-of-way. The Department had a contractual duty to timely acquire all right-of-way as part of its duty to furnish its contractor with a work site so the contractor could perform its side of the bargain. The trial court erred in holding as a matter of law that this contractual breach by the Department was excused under the two contracts' "no damages for delay" clauses. While those causes covered delays attributable to utility relocation problems, they do not cover general delays due to the Department's failure to provide the contractor the promised work site. Consequently, we vacate that portion of the summary judgments in these cases.

## V.

The judgment is affirmed with respect to the action based on negligence and negligence per se. The judgment is reversed with respect to the action for damages for breach of contract stemming from the delay in procuring the necessary rights-of-way. The cases are remanded for trial on this issue. We assess the costs in equal proportions to Thomas & Associates, Inc. and its surety and to the State of Tennessee for which execution, if necessary, may issue.

PER CURIAM

---

[8]Tract No. 17 on Project 4622 was the same parcel as Tract No. 2 on Project 4105. This one piece of commercial property, a corner lot with two sides of road frontage (sometimes referred to as the Klee Investment Tract) was the biggest hold-up in acquiring right-of-way for the revamped intersection. For the Department to widen the roadway in this particular spot evidently involved the partial demolition and refacing of the front of an existing building. When negotiations with the owner to buy the property failed, the Department had to resort to court-ordered condemnation.